Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                    Docket No.:          (    )
GEICO CASUALTY COMPANY,

                              Plaintiffs,

          -against-                                                    **Plaintiffs Demand a Trial**
                                                                       **by Jury**

JOHN J. MCGEE, D.O., INTEGRATED
MEDICAL REHABILITATION AND DIAGNOSTICS
P.C., and JOHN DOE DEFENDANTS "1" - "10,"

                              Defendants.
----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, John J. McGee, D.O., Integrated

Medical Rehabilitation and Diagnostics P.C., and John Doe Defendants "1" through "10"

(collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $390,000.00 that Defendants wrongfully obtained from GEICO by submitting, or causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported patient examinations, electromyography ("EMG") and nerve conduction velocity ("NCV") tests, trigger point injections with ultrasonic guidance, and outcome assessment tests (collectively, the "Fraudulent Services"), which were allegedly provided to New York automobile accident victims insured by GEICO ("Insureds") and other New York automobile insurers.

2.      Defendant John J. McGee, D.O. ("McGee") is a physician licensed to practice in New York who purports to own Defendant Integrated Medical Rehabilitation and Diagnostics, P.C. ("Integrated"), which has billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  Integrated purports to be a legitimate professional corporation, but it operates on a transient basis, maintaining no stand-alone practice, having no patients of its own, and providing no legitimate or medically necessary services.

3.      McGee, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit Integrated to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      GEICO seeks to recover the monies stolen from it, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $250,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Integrated because:

> (i)      the Fraudulent Services were not medically necessary and were provided –
> to  the  extent  provided  at  all  –  pursuant  to  pre-determined  fraudulent

protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(iv) in many cases, the Fraudulent Services – to the extent provided at all – were provided by independent contractors rather than by employees of Integrated, and therefore were not reimbursable.

5. Defendants fall into the following categories:

(i) Defendant John J. McGee, D.O. ("McGee") is a physician licensed to practice medicine in the State of New York, who purports to own Integrated, and who purported to perform some of the Fraudulent Services.

(ii) Defendant Integrated is a New York medical professional corporation, through which the Fraudulent Services purportedly were performed, and were billed to New York automobile insurance companies, including GEICO.

(iii) John Doe Defendants "1"-"10" are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Integrated, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6. As discussed herein, Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to

the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services – to the extent provided at all – were provided by independent contractors, rather than by employees of McGee or Integrated.

7.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

8.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

9.     The Defendants' fraudulent scheme began as early as 2022 and has continued uninterrupted through the present day, as Integrated continues to bill GEICO and seek collection on pending charges for the Fraudulent Services.

10.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $390,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.    **Defendants**

12.    Defendant McGee resides in and is a citizen of New York.  McGee became licensed to practice medicine in New York on December 19, 1985 and serves as the nominal owner of Integrated.

13.    Defendant Integrated is a New York professional corporation incorporated on or about January 18, 2005, with its principal place of business in New York.  Integrated purports to be owned and controlled by McGee.

14.    Integrated and McGee were previously named as Defendants in a series of lawsuits filed by multiple automobile insurance carriers, each of which alleged, among other things, that Integrated and a series of other professional corporations purportedly owned by McGee were illegally owned and controlled by unlicensed laypersons in violation of New York law.  See State Farm Mutual Automobile Insurance Company v. McGee, et al., Dkt. No. 1:10-cv-03848(PKC)(RML) (E.D.N.Y. 2010); Allstate Insurance Company, et al. v. Ilyaich, et al., Dkt. No. 1:13-cv-05464(NG)(LB) (E.D.N.Y. 2013).

15.    At or around the time that the above-referenced lawsuits were commenced against McGee and Integrated, the professional corporation ceased billing to GEICO.  However, in January 2022, Integrated once again commenced billing GEICO, and since January 2022, Integrated has been used by McGee and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

16.    Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York. John Doe Defendants "1"-"10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the provision of medically unnecessary services, engaging in

illegal financial and kickback arrangements to obtain patient referrals for Integrated, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

19.     GEICO underwrites automobile insurance in New York.

20.     New York's No-Fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

22.     An Insured can assign his/her right to No-Fault Benefits to healthcare goods and services providers in exchange for those services.

23.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as an "HCFA-1500" form).

24.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

26.     In New York, only a licensed physician may: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

27.     Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

7

28.     New York law prohibits licensed healthcare providers from paying or accepting payments (i.e., kickbacks) in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

29.     Pursuant to Education Law § 6512, § 6530(11), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

30.     Pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

31.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate its treatments, or if it engages in unlawful fee splitting with unlicensed individuals.

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits; and (ii) insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and/or local laws.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

33.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits.  There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law ….

34.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

35.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

36.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

37.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     Overview of the Defendants' Fraudulent Scheme

38.     Beginning in 2021, and continuing through the present day, McGee, Integrated, and John Doe Defendants "1"-"10" (collectively, the "Defendants"), devised and implemented a complex fraudulent scheme in which Integrated was used to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

39.     The Fraudulent Services billed using Integrated's name and tax identification number were not medically necessary and were provided – to the extent provided at all – pursuant to (i) pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (ii) the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

40.     McGee did not operate Integrated at any single, fixed location.

41.     McGee, instead, operated Integrated on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where Integrated received steady volumes of patients through no efforts of its own, including at the following locations (collectively, the "Clinics"):

- 1339 East Gun Hill Road, Bronx;
- 13525 79th Street, Howard Beach;
- 14 Bruckner Boulevard, Brooklyn;
- 2598 Third Avenue, Bronx;
- 42-26A Third Avenue, Bronx;
- 513 Church Avenue, Brooklyn; and

- 903 Sheridan Avenue, Bronx

42.     McGee and Integrated, in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial and kickback arrangements with the John Doe Defendants, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

43.     Thereafter, McGee and Integrated, in coordination with the John Doe Defendants, subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services all solely to maximize profits without regard to genuine patient care.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

44.      Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics were actually organized to supply "one-stop" shops for no-fault insurance fraud.

45.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

46.     McGee did not have his own patients at the Clinics and did nothing to create a patient base.

47.     McGee did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of Integrated at the Clinics.

48.     McGee did virtually nothing that would be expected of the owner of a legitimate medical professional corporation to develop its reputation and attract patients.

49.     As McGee did not have any patients of his own at the Clinics, the healthcare services that he could provide to the patients at the Clinics was limited and controlled by the John

Doe Defendants, who were interested only in maximizing profits without regard to genuine patient care.

50.     The Clinics provided facilities for Integrated, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

51.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

52.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 14 Bruckner Boulevard, Brooklyn from a "revolving door" of more than 80 purportedly different healthcare providers.

53.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 513 Church Avenue, Brooklyn from a "revolving door" of more than 80 purportedly different healthcare providers.

54.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 1339 East Gun Hill Road, Bronx from a "revolving door" of more than 40 purportedly different healthcare providers.

55.     In keeping with the fact that unlicensed laypersons controlled many of the Clinics and that the Defendants paid illegal kickbacks in exchange for patient referrals, GEICO has

identified in a series of related investigations that a group of unlicensed laypersons combined to misappropriate and illegally use the name, New York license, signature and other relevant information of healthcare professionals based out of Maryland, New York and Missouri to bill GEICO for services purportedly performed at, among other locations, 1339 East Gun Hill Road, Bronx; 13525 79th Street, Howard Beach; 14 Bruckner Boulevard, Brooklyn; 2598 Third Avenue, Bronx; and 42-26A Third Avenue, Bronx.  See Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-03598 (BMC)(E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-06187(KAM)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Susan J. Polino PhD., et al., Dkt. No. 1:22-cv-05178(ARR)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Poonawala, et al., Dkt. No. 1:22-cv-03063(PKC)(VMS) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Bily-Linder, et al., Dkt. No. 1:23-cv-00515(FB)(RML) (E.D.N.Y.).

56.    McGee in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, including the John Doe Defendants, who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

57.    The Clinics willingly provided access to Integrated in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by No-Fault insurance and therefore catered to high volumes of Insureds at the locations.

58.    The financial arrangements into which McGee and Integrated entered included the payment of fees ostensibly to "rent" space or personnel from the Clinics or fees for ostensibly legitimate services.

59.     However, the financial arrangements into which McGee and Integrated entered were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to Integrated for medically unnecessary services at the Clinics.

60.     In keeping with the fact that the ostensibly legitimate "rent" payments by McGee and Integrated were actually disguised kickbacks in exchange for patient referrals, the amounts of the "rental" payments were far in excess of the legitimate, fair market value of the putative non-exclusive use of the clinic locations.

61.     For example, Integrated and McGee paid at least $1,000.00 per month in purported "rent" at multiple Clinics, despite the fact that Integrated and McGee used non-exclusive space and rendered services only approximately twice per month at each Clinic.

62.     In further keeping with the fact that the purported "rent" payments were really disguised kickbacks in exchange for patient referrals and that the healthcare services purportedly provided by McGee and Integrated were limited and controlled by the John Doe Defendants, the types of healthcare services that McGee and Integrated were allowed to perform at the various Clinics were directly tied to the particular clinic where the service was performed.

63.     For example, at the Clinics located at 2598 Third Avenue, Bronx; 42-26A Third Avenue, Bronx; 513 Church Avenue, Brooklyn; and 903 Sheridan Avenue, Bronx, McGee and Integrated were limited to performing patient examinations and electrodiagnostic testing.

64.     At the Clinics located at 1339 East Gun Hill Road, Bronx; 13525 79th Street, Howard Beach; and 14 Bruckner Boulevard, Brooklyn, McGee and Integrated were limited to performing patient examinations, trigger point injections with ultrasonic guidance, and outcome assessment tests.  In situations where Insureds received electrodiagnostic testing at these Clinics, rather than perform the electrodiagnostic testing himself, McGee would have to refer the patient

to a different practice operating out of these Clinics, despite the fact that McGee and Integrated were purportedly actively performing electrodiagnostic testing at other locations.

65.     In further keeping with the fact that the payments made by McGee and Integrated were in actuality disguised kickbacks in exchange for patient referrals, McGee and Integrated provided no legitimate or necessary services that warranted other providers at the Clinics to bring in McGee and Integrated to the Clinics to treat the patients.

66.     McGee and Integrated made the various kickback payments in exchange for having Insureds referred to Integrated for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

67.      The unlawful kickback and referral arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships with the John Doe Defendants, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

68.     The Defendants at all times knew that the kickback and referral arrangements were illegal and therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

### C.     The Defendants' Fraudulent Treatment and Billing Protocol

69.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants implemented a scheme whereby Integrated purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

70.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

71.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

72.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.     The Fraudulent Charges for Initial Examinations**

73.     Upon receiving a referral pursuant to the kickbacks that McGee and Integrated paid to the unlicensed laypersons associated with the Clinics, the Defendants purported to provide virtually all of the Insureds in the claims identified in Exhibit "1" with an initial examination.

74.     In keeping with the fact that the initial examinations were performed pursuant to the kickbacks that McGee and Integrated paid at the Clinics, Integrated virtually always purported to perform the initial examinations at the Clinics where it obtained the initial referrals, rather than at any stand-alone practice.

75.     The initial examinations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" that served as purported justification for the exploitation of the Insureds through other medically unnecessary and illusory services.

76.     Typically, either McGee or someone associated with McGee and Integrated purported to perform the initial examinations, which were then billed to GEICO through Integrated.

77.     Integrated typically billed the initial examinations under either CPT code: (i) 99204, typically resulting in a charge of $163.01 or $203.76; or (ii) 99203, typically resulting in a charge of $142.62.

78.     The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with John Doe Defendants 1-10, not to treat or otherwise benefit the Insureds.

79.     Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

80.     For example, in every claim identified in Exhibit "1" for initial examinations under CPT codes 99204 and 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insured or the Insureds' families.

81.     The use of CPT code 99204 typically requires that a healthcare professional spend 45 minutes of face-to-face time with the Insured or the Insured's family.

82.     The use of CPT code 99203 typically requires that a healthcare professional spend 30 minutes of face-to-face time with the Insured or the Insured's family.

83.     Though the Defendants billed for most of their initial examinations under CPT code 99204 and 99203, no healthcare professional associated with the Defendants spent 30 minutes, let alone 45 minutes, on an initial examination.

84.     Rather the initial examinations in the claims identified in Exhibit "1" rarely lasted more than 10-15 minutes.

85.     In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, McGee and Integrated used checklist forms in purporting to conduct the initial examinations.

86.     The checklist forms that McGee and Integrated used in conducting the initial examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

87.     All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

88.     These interviews and examinations did not require the Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds during the putative initial examinations.

89.     In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99204, or caused them to be submitted, they falsely represented that a healthcare professional associated with Integrated: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

90.     Further, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a healthcare professional associated with Integrated: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity".

        a.      **Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories**

91.     Pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99204, they represented that they took a "comprehensive" patient history.

92.     In addition, according to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, they represented that they took a "detailed" patient history.

93.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

94.     Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

95.     The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)   integumentary (skin and/or breast);

(x)    neurological;

(xi)   psychiatric;

(xii)  endocrine;

(xiii) hematologic/lymphatic; and

(xiv)  allergic/immunologic.

96.    When the Defendants billed for the initial examinations under CPT code 99204 they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

97.    In fact, Defendants did not take a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

98.    Furthermore, pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

99.    However, Defendants did not take a "detailed" patient history from Insureds during the initial examinations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

100.   Rather, after purporting to provide the initial examinations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

101.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

### b.    Misrepresentations Regarding "Comprehensive" and "Detailed" Physical Examinations

102.    Moreover, pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

103.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

104.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

105.    When the Defendants billed for the initial examinations under CPT code 99204 they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

106.    In fact, Defendants did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

107.    For instance, Defendants did not conduct any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

108.    Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g. scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

109.   Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

110.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)   measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

     (iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

     (v)     brief assessment of mental status;

     (vi)     examination of gait and station;

     (vii)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

     (viii)     coordination;

     (ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

     (x)     examination of sensation.

111.    When the Defendants billed for the initial examination under CPT code 99203, they falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations.

112.    In fact, the Defendants did not conduct a detailed patient examination of Insureds, because they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

### c.    Misrepresentations Regarding the Extent of Medical Decision-Making

113.    Similarly, when the Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

114.    When the Defendants submitted charges for initial examinations under CPT code 99203, they represented that they engaged in medical decision making of "low complexity".

115.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be

considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

116.     Though the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT code 99204) or "low complexity" (when billed under CPT code 99203), in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

117.     First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints to the extent that they ever had any complaints arising from automobile accidents at all.

118.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Integrated, to the extent that Integrated provided any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Integrated actually provided was limited to a series of medically unnecessary diagnostic tests or injections, none of which were health or life-threatening if properly administered.

119.     Second, Integrated did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

120.    In fact, no physician associated with Integrated engaged in any medical decision-making at all.  Rather, the outcomes of the initial examinations were pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains and strains.

121.    The initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

### 2.    The Fraudulent Charges for Follow-Up Examinations

122.    In addition to their fraudulent initial examinations, Integrated purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

123.    Integrated typically billed for the follow-up examinations under either CPT code: (i) 99214, typically resulting in a charge of $101.93 or $127.41; or (ii) 99213, typically resulting in a charge of $87.80.

124.    Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that McGee and Integrated paid at the Clinics not to treat or otherwise benefit the Insureds.

### 3.    The Fraudulent Charges for Outcome Assessment Testing

125.    In addition to the initial and follow-up examinations, Integrated, in many of the claims listed in Exhibit "1", also subjected Insureds to medically unnecessary outcome assessment tests ("OAT"), often on or about the same dates it purportedly subjected Insureds to an initial or follow-up examination.

126.     Integrated billed the OAT submitted to GEICO using CPT code 99358, typically resulting in charges of $224.10 or $280.12 for each session of OAT.

127.     Like Integrated's charges for the other Fraudulent Services, the charges for the OAT were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to Defendants' illegal kickback and referral arrangements as well as their fraudulent treatment and billing protocols.

128.     Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the OAT that Integrated purportedly provided was nothing more than a questionnaire regarding each Insured's history and physical condition, the Fee Schedule provides that the OAT should have been reimbursed as an element of the patient's initial and follow-up examinations.

129.     In other words, healthcare providers cannot conduct and bill for patient examinations and then bill separately for contemporaneously provided OAT.

130.     In the event Integrated did perform the OAT that it billed to GEICO, the information gained using the OAT would not have been significantly different from the information that Integrated purported to obtain during the patient history and physical examinations it purported to perform as part of virtually every Insured's initial and/or follow-up examination.  In fact, Integrated, in its billing for fraudulent initial and follow-up examinations, represented that it took at least a "detailed" patient history and performed a "detailed" physical examination.

131.     The OAT represented purposeful and unnecessary duplication of the patient histories purportedly conducted during the Insureds' initial and follow-up examinations. In that regard, the OAT were part and parcel of the Defendants' overall fraudulent scheme, inasmuch as

the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich Defendants and in no way aided in the assessment and treatment of the Insureds.

132.    Integrated's use of CPT code 99358 to bill for the OAT also constituted a deliberate misrepresentation of the extent of the service that was provided.  Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

133.    Though Integrated routinely submitted billing under CPT code 99358 for OAT, neither McGee nor any healthcare professional associated with Integrated spent an hour reviewing or administering the tests or communicating with the Insureds or their families.

134.    Indeed, the OAT did not require any physician involvement at all, because the "tests" simply were questionnaires that were completed by the Insureds.

135.    In fact, Integrated did not even bother to prepare a narrative report summarizing the test results. Instead, Integrated submitted the questionnaires with no indication that McGee or any healthcare professional associated with Integrated performed any services whatsoever in connection with the OAT, let alone an hour of prolonged services.

136.    Unsurprisingly, since the OAT was medically unnecessary and performed pursuant to Integrated's pre-determined fraudulent treatment protocols and illegal kickback and referral arrangements, the results of the OAT, like the other Fraudulent Services, was not incorporated into the Insureds' respective treatment plans.

**4.    The Fraudulent Charges for Trigger Point Injections with Ultrasonic Guidance**

137.    In addition to the fraudulent examinations and outcome assessment testing, Integrated, in many of the claims listed in Exhibit "1", also subjected Insureds to medically unnecessary trigger point injections, often on or about the same dates it purportedly subjected Insureds to an initial or follow-up examination with outcome assessment testing.

138.    The sole purpose of these medically unnecessary injections was to enrich the Defendants as the injections were performed regardless of the Insureds' symptoms or complaints.

139.    Defendants then typically billed the trigger point injections to GEICO through Integrated under CPT code 20553, generally resulting in a charge of either $104.81 or $131.01 for each round of trigger point injections that they purported to provide.

140.    Like the Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

**(i)    Legitimate Use of Trigger Point Injections**

141.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located.  Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

142.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point.  Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

143.    Any legitimate trigger point treatment should begin with conservative therapies such as active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

144.    In a legitimate trigger point treatment, trigger point injections should typically not be administered until after a patient has had the opportunity to fail conservative management.

**(ii)    The Defendants' Medically Unnecessary Trigger Point Injections Under Ultrasound Guidance**

145.     Defendants typically did not wait until any Insured failed conservative therapies before purporting to provide trigger point injections, because conservative therapy is not sufficiently remunerative.

146.    Instead, Defendants frequently purported to provide trigger point injections to Insureds within the first week or two – and often within <u>days</u> – after the Insureds' automobile accidents, before the Insureds could have failed conservative therapies.  For instance:

    (i)    On April 15, 2022, an Insured named BY was involved in an automobile accident.  Just five days later, on April 20, 2022, the Defendants purported to provide trigger point injections to BY, which they billed to GEICO through Integrated, despite the fact that BY could not have – by that point – failed a course of conservative therapy.

    (ii)    On April 17, 2022, an Insured named EL was involved in an automobile accident.  Just three days later, on April 20, 2022, the Defendants purported to provide trigger point injections to EL, which they billed to GEICO through Integrated, despite the fact that EL could not have – by that point – failed a course of conservative therapy.

    (iii)    On October 13, 2022, an Insured named JC was involved in an automobile accident.  Just one day later, on October 14, 2022, the Defendants purported to provide trigger point injections to JC, which they billed to GEICO through Integrated, despite the fact that JC could not have – by that point – failed a course of conservative therapy.

    (iv)    On July 3, 2022, an Insured named DN was involved in an automobile accident.  Just two days later, on July 5, 2022, the Defendants purported to provide trigger point injections to DN, which they billed to GEICO through

Integrated, despite the fact that DN could not have – by that point – failed a course of conservative therapy.

(v)    On May 30, 2022, an Insured named MB was involved in an automobile accident. Just four days later, on June 3, 2022, the Defendants purported to provide trigger point injections to MB, which they billed to GEICO through Integrated, despite the fact that MB could not have – by that point – failed a course of conservative therapy.

(vi)    On June 22, 2022, an Insured named PA was involved in an automobile accident. Just two days later, on June 24, 2022, the Defendants purported to provide trigger point injections to PA, which they billed to GEICO through Integrated, despite the fact that PA could not have – by that point – failed a course of conservative therapy.

(vii)    On June 22, 2022, an Insured named VJ was involved in an automobile accident. Just two days later, on June 24, 2022, the Defendants purported to provide trigger point injections to VJ, which they billed to GEICO through Integrated, despite the fact that VJ could not have – by that point – failed a course of conservative therapy.

(viii)    On June 25, 2022, an Insured named CM was involved in an automobile accident. Just two days later, on June 27, 2022, the Defendants purported to provide trigger point injections to CM, which they billed to GEICO through Integrated, despite the fact that CM could not have – by that point – failed a course of conservative therapy.

(ix)    On June 28, 2022, an Insured named EH was involved in an automobile accident. Just two days later, on June 30, 2022, the Defendants purported to provide trigger point injections to EH, which they billed to GEICO through Integrated, despite the fact that EH could not have – by that point – failed a course of conservative therapy.

(x)    On October 14, 2022, an Insured named EB was involved in an automobile accident. Just three days later, on October 17, 2022, the Defendants purported to provide trigger point injections to EB, which they billed to GEICO through Integrated, despite the fact that EB could not have – by that point – failed a course of conservative therapy.

147.    These are only representative examples.

148.    In the claims for trigger point injections identified in Exhibit "1", Integrated and

McGee routinely purported to provide trigger point injections to Insureds within the first week or

two – and often within <u>days</u> – after the Insureds' automobile accidents, before the Insureds could have failed conservative therapies.

149.    Moreover, to further increase the amount of fraudulent billing they could submit to GEICO and other insurers, Defendants routinely submitted a separate charge of between $173.52 and $289.20, under CPT code 76942, for supposed "ultrasound guidance" used in the provision of the medically unnecessary trigger point injections.

150.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

151.    In fact, in a legitimate clinical setting, trigger point injections may be provided in an office setting, and generally do not require the use of ultrasound guidance.

152.    Even so, in order to maximize the amount of billing they could cause to be submitted to GEICO, Defendants virtually always purported to provide trigger point injections using ultrasound guidance.

**5.      The Fraudulent Charges for Electrodiagnostic Testing**

153.    Based upon the fraudulent, pre-determined "diagnoses" that Defendants purported to provide to Insureds during the purported initial examinations, they then purported to subject many of the Insureds in the claims identified in Exhibit "1" to a series of medically unnecessary electrodiagnostic tests, including NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests).

154.     Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

### (i)     The Human Nervous System and Electrodiagnostic Testing

155.     The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

156.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves.  They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

157.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

158.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Integrated and McGee because they were medically necessary to determine whether the Insureds had radiculopathies.

159.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

160.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

161.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves, with or without F-wave studies; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

162.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

**(ii)    The Fraudulent NCV Tests**

163.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the

"latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

164.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

165.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

166.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

167.    To extract the maximum billing out of each Insured who supposedly received NCV tests, Integrated and McGee routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Integrated and McGee routinely purported to perform and/or provide: (i) NCV tests of at least four motor nerves; (ii) NCV tests of at least five sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies.

168.    For example:

(i)    On August 11, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave

studies; and (iii) two H-reflex studies to an Insured named NW.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(ii)   On August 4, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named IR.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(iii)  On March 10, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named ME.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(iv)   On December 16, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named WM.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(v)    On September 13, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named MM.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(vi)   On November 15, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named MS.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(vii)  On December 27, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named DA.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(viii) On October 26, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named PS.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(ix)   On September 14, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named BDS.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

(x)    On September 14, 2022, McGee and Integrated purported to provide: (i) five sensory nerve NCV tests; (ii) four motor nerve NCV tests with F-wave

studies; and (iii) two H-reflex studies to an Insured named GA.  Defendants then billed GEICO $1,596.16 for these tests through Integrated.

169.    These are only representative examples.

170.    In many of the claims for NCV tests identified in Exhibit "1", McGee and Integrated purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

171.    McGee and Integrated purported to provide and/or perform NCVs on more nerves than recommended by the Recommended Policy to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies or any other conditions.

172.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both the sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

173.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.  As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

174.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

175.    This concept is also emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

176.    Even so, McGee and Integrated did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

177.    Instead, McGee and Integrated applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in most of the claims identified in Exhibit "1".

178.    Specifically, in most of the claims for NCV testing in Exhibit "1", McGee and Integrated purported to test some combination – and, in many instances, all – of the following peripheral nerves and nerve fibers in each Insured whom they purported to provide NCV tests:

    (i)      left and right median motor nerves;

    (ii)     left and right peroneal motor nerves;

    (iii)    left and right tibial motor nerves;

    (iv)     left and right ulnar motor nerves;

    (v)      left and right median sensory nerves;

    (vi)     left and right radial sensory nerves;

    (vii)    left and right superficial peroneal sensory nerves;

    (viii)   left and right sural sensory nerves; and

    (ix)     left and right ulnar sensory nerves.

179.    The cookie cutter approach to the NCVs that McGee and Integrated purported to provide to Insureds clearly was not based on medical necessity.  Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that McGee and Integrated could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

   **(iii)    The Fraudulent EMG Tests**

180.    As part of their pre-determined fraudulent treatment and billing protocol, the Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.

181.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

182.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

183.    McGee and Integrated did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

184.    Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that McGee and Integrated purported to provide and/or perform frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

185.    Nevertheless, Defendants routinely purported to provide and/or perform EMGs on all four limbs on virtually every Insured, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that they could reap from each Insured.

186.    In keeping with the fact that the Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the Defendants virtually always performed (or purported to perform) the EMG and NCV tests immediately following the initial examination.

187.    A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Defendants to spend at least two hours with each patient.  The fact that each of the patients purportedly subjected to the fraudulent EMG and NCV tests purportedly set aside two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests are rendered pursuant to a pre-determined treatment protocol, or (ii) the Fraudulent Services were not actually performed as billed.

**(iv)    The Fraudulently Unbundled Charges for Electrodiagnostic Testing**

188.    In addition to billing for medically unnecessary EDX tests, the Defendants also intentionally unbundled their billing for EDX tests to maximize the fraudulent charges that they submitted to GEICO through Integrated.

189.    The large majority of the Defendants' billing submissions to GEICO for electrodiagnostic testing included: (i) charges for EMG tests under CPT code 95886; (ii) charges for NCV tests under CPT code 95911; and (iii) an additional charge under CPT code 95905.

190.    Defendants typically charged more than $1,000.00 for services purportedly provided under CPT code 95905.

191.    The Fee Schedule defines CPT code 95905 as "motor and/or sensory nerve conduction, using preconfigured electrode array(s), amplitude and latency/velocity study, each limb, includes F-wave study when performed, with interpretation and report".

192.    Pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, "[i]t would not be appropriate to report [CPT] code 95905 in addition to [CPT] codes…95886, or 95907-95913".

193.    Thus, to the extent that the Defendants actually provided the EDX tests to GEICO's Insureds, they were not permitted to submit a separate charge under CPT code 95905 in addition to the charges submitted under CPT codes 95886 and 95911.

194.    The Defendants included an additional charge under CPT code 95905 on virtually all of their bills for EDX tests in order to inflate the fraudulent billing for EDX tests by an order of magnitude.

**D.    The Fraudulent Billing for Independent Contractor Services**

195.    The Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of Integrated seeking payment for services provided by independent contractors.

196.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

197.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement

under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

198.    In many instances, the Defendants submitted charges to GEICO and other insurers for Fraudulent Services that purportedly were performed by healthcare professionals other than McGee, including another physician, a nurse practitioner, and a physician assistant.

199.    The healthcare professionals working under the name of Integrated worked without any supervision by McGee.

200.    The healthcare professionals working under the names of Integrated did not exclusively provide services for Integrated.

201.    For example, a physician working under the name of Integrated was simultaneously working under the name of at least one other healthcare practice.

202.    To the extent that they were performed in the first instance, all the Fraudulent Services performed by healthcare services providers other than McGee were performed by healthcare professionals whom the Defendants treated as independent contractors.

203.    For instance, the Defendants:

(i)    established an understanding with the health care professionals that they were independent contractors, rather than employees;

(ii)    paid no employee benefits to the health care professionals;

(iii)    compelled the health care professionals to pay for their own malpractice insurance at their own expense;

(iv)    permitted the health care professionals to set their own schedules and days on which they desired to perform services;

(v)    permitted the health care professionals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices; and

(vi)    failed to cover the health care professionals for either unemployment or workers' compensation benefits.

204.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance avoiding the need to secure any malpractice insurance and avoiding claims of agency-based liability arising from work performed by the health care professionals.

205.    Because the health care professionals were independent contractors and performed many of the Fraudulent Services, the Defendants never had any right to bill or collect PIP Benefits in connection with those services.

206.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of Integrated to make it appear as if the services were eligible for reimbursement.

207.    The Defendants' misrepresentations were consciously designed to mislead GEICO

into believing that it was obligated to pay for these services, when in fact GEICO was not.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

208.    To support their fraudulent charges, Defendants systematically submitted or caused

to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports through

Integrated to GEICO seeking payment for the Fraudulent Services for which the Defendants were

not entitled to receive payments.

209.    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted to GEICO

by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)    With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by McGee, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were

performed because the services were provided by independent contractors, to the extent they were provided at all.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

210.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

211.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

212.    Specifically, the Defendants knowingly misrepresented and concealed facts related to Integrated in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

213.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

214.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

215.    In addition, Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with Integrated in order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by Integrated.

216.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

217.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

218.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $390,000.00 based upon the fraudulent charges.

219.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against McGee and Integrated**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221.    There is an actual case in controversy between GEICO and Integrated regarding more than $250,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

222.    McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

223.    McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

224.    McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments paid for patient referrals.

225.    McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Integrated.

226.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO under the names of Integrated.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against McGee and Integrated
### (Common Law Fraud)

227.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

228.    McGee and Integrated intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

229.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Integrated was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Integrated and McGee; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Integrated, when in fact many of the billed-for services were provided by independent contractors.

230.    McGee and Integrated intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Integrated that were not compensable under the No-Fault Laws.

231.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $390,000.00 pursuant to the fraudulent bills submitted by Defendants through Integrated.

232.     McGee and Integrated's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

233.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against McGee and Integrated**
**(Unjust Enrichment)**

234.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

235.     As set forth above, McGee and Integrated have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

236.     When GEICO paid the bills and charges submitted by or on behalf of Integrated for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

237.     McGee and Integrated have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

238.     McGee and Integrated's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

239.     By reason of the above, McGee and Integrated have been unjustly enriched in an amount to be determined at trial, but in no event less than $390,000.00.

<b><u>AS AND FOR A FOURTH CAUSE OF ACTION</u></b><br/><b>Against John Doe Defendants "1-10"</b><br/><b>(Aiding and Abetting Fraud)</b>

240.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

241.     John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by McGee and Integrated.

242.     The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Integrated in exchange for illegal kickbacks from McGee and Integrated and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

243.     The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for McGee or Integrated to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

244.     John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to McGee and Integrated for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

245.    The conduct of John Doe Defendants "1-10" caused GEICO to pay more than $390,000.00 pursuant to the fraudulent bills submitted through Integrated.

246.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

247.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

248.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against McGee and Integrated, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that McGee and Integrated have no right to receive payment for any pending bills submitted to GEICO through Integrated;

B.    On the Second Cause of Action against McGee and Integrated, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $390,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

C.    On the Third Cause of Action against McGee and Integrated, more than $390,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $390,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: October 17, 2023

RIVKIN RADLER LLP


By:___/s/ Barry Levy_____
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Sean Gorton, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

7485683.v7